**NEAD v BARRS RENT-A-CAR CO.**

Ohio Appeals, 1st Dist, Hamilton Co

No 5915.   Decided Mar 24, 1941

Siegfried Geismar, Cincinnati, and Wm. W. Doyle, for appellant.

David L. Shannon, Cincinnati, for appellee.

## OPINION

By HAMILTON, J.

Heard on appeal on questions of law.

This action was to enforce payment of a certain judgment on a bond, executed by the defendant to the City of Cincinnati, in order to procure a license to operate a Rent-A-Car Corporation.

Plaintiff's amended petition alleges that the defendant, Barrs Rent-A-Car Corporation is engaged in the business of renting out automobiles for hire, or driverless automobiles in the City of Cincinnati, Ohio. That on the 26th of February, 1938, defendant was the owner of a certain auto for hire, which on that day it rented to a certain Bruce Jones. That on said 26th day of February, 1938, at about 8:55 P. M., the plaintiff was a guest passenger in an automobile which was being operated southwardly on Clifton Avenue in the City of Cincinnati, Ohio, and that while such guest passenger, the automobile in which she was riding was negligently run into by the automobile belonging to the defendant herein, which was then and there being operated by the said Bruce Jones. That as a result of said collision, plaintiff sustained serious, severe, and permanent injuries. Plaintiff thereupon instituted an action in the Court of Common Pleas of Hamilton County against said Bruce Jones, and the result of the trial in that action was a judgment in favor of the plaintiff and against Bruce Jones in the sum of $2568.46.

Plaintiff further alleges that said judgment was at no time vacated, set aside, or held for naught, and is still in full force and effect, and remains unpaid; that execution was issued on said judgment on the 12th day of May, 1939, but returned unsatisfied.

Plaintiff further states that at the time said collision occurred, to-wit: on the 26th day of February, 1938, there was in full force and effect an ordinance of the City of Cincinnati, Ohio, which said ordinance is No. 286-1936 of the City of Cincinnati. This ordinance provided for the giving and filing of an insurance policy by one engaged in the business of operating public vehicles or vehicles for hire, before a license would

be granted for the privilege of operating such business.

At the same time, there was in full force and effect §65-7a, which is as follows:

"Sec. 65-7a. Liability insurance for privilege Auto for hire. No license to operate a driverless auto for hire shall be issued or renewed by the city treasurer, and it shall be unlawful to operate any such public vehicle, or permit the same to be operated, unless and until the applicant shall deposit with the city treasurer a policy or policies of liability insurance issued by a responsible insurance company, approved as to sufficiency by the city treasurer and as to legality by the city solicitor, providing indemnity for or protection to the rentee against loss in the amount provided for in §§65-8, 65-9, and 65-10, and agreeing to pay within the limits of the amounts fixed in said sections to any judgment creditor, any final judgment rendered against the rentee by reason of the liability to the rentee to pay damages to others except to occupants of such driverless auto for hire for bodily injuries, including death at any time resulting therefrom, and and for damages to or destruction of property sustained during the term of said policy resulting from negligent operation, maintenance or use of such driverless auto for hire; provided that any person claiming the protection of this section shall within thirty (30) days after the date of the accident out of which the injury, or damage shall arise file with the city treasurer his claim for injury or damages together with a statement setting forth, to the best of his knowledge, the day, hour and place of the accident, the license number of the vehicle at fault, the name and address of the driver, if known, and the names and addresses of witnesses of the accident to the extent the same are known to him, except that where the injured person is by the accident rendered incapable of preparing the claim and statement required herein, such claim and statement may be filed within thirty (30)

days after such person shall become able to prepare the same or, in the case of death resulting from injury, within thirty (30) days after the date of death."

Licensee is permitted by ordinance to file a bond in lieu of the policy requirement, furnishing the same protection as a policy.

Plaintiff further alleges that the defendant failed to comply with the provisions of this ordinance, and did not file a policy of liability insurance providing indemnity for or protection against loss or damages for bodily injuries, but executed in lieu thereof a bond, the terms of which said bond are set forth in the petition, and procured its license to transact business.

The plaintiff prays for judgment against the defendant in said sum of $2568.46, with interest and costs.

The defendant set up in its answer, after admitting its corporate existence and the admission of the business in which it is engaged; that on February 26th, 1938, it rented the automobile to one Bruce Jones. It then admits the execution of the bond to the City of Cincinnati, pursuant to the ordinances, and follows these admissions with a general denial.

A jury was waived and the case was tried to the court.

The case was tried to the court on the sole issue of whether or not the plaintiff had duly filed her claim with the City Treasurer of the City of Cincinnati, or whether she came within the exception in accordance with the terms and requirements of ordinance §65-7a, which provides among other things: "except that where the injured person is by the accident rendered incapable of preparing the claim and statement required herein, such claim and statement may be filed within thirty (30) days after such person shall become able to prepare the same or, in the case of death resulting from injury, within thirty (30) days after the date of death."

It is shown by the record that the injury occurred February 26th, 1938. The record further discloses that the claim was filed with the City Treasurer on April 15th, 1938, which would be more than thirty (30) days after the accident, which is the time within which claims must be filed according to the provisions of the ordinance, unless the person injured was rendered incapable of doing so within that time because of the injuries received in the accident.

The issue, therefore, before the Court was: Was the plaintiff incapacitated and excused from filing her claim by reason of her injuries, and did she come within the thirty (30) day extension granted in the ordinance for the filing of the claim by reason thereof?

At the close of the evidence, the Court granted the motion of the defendant for judgment, and judgment was entered in favor of the defendant. From that judgment, the appeal is prosecuted.

The sole question argued here and for consideration is, whether or not under the evidence, the time for filing of the claim with the City Treasurer was extended by reason of the plaintiff's disability.

We find no precedent and none has been cited directly on the question involved here as to what constitutes disability. This question has been before the courts many times in cases involving insurance policies, and the construction in those cases are of material aid in arriving at a proper conclusion on the question.

In those cases it has been held many times that the total disability provisions of a life insurance policy should be construed liberally, to give effect the terms of the contract, that is, to indemnify the insured to perform his regular work and carry on his usual business by reason of the happening covered by the policy.

In 29 Am. Jur. §1161, it is stated:

"The rule prevailing in most jurisdictions is that the 'total disability' contemplated by a sickness or acci-

dent insurance policy, or the disability clause of a life insurance policy, does not mean, as its liberal construction would require, a state of absolute helplessness, but contemplates rather such a disability as renders the insured unable to perform all the substantial and material acts necessary to the prosecution of his business or occupation in a customary and usual manner. * * *"

Many cases are cited in the footnote supporting this proposition.

We apply this rule in the case at issue by analogy, and find it would mean that the plaintiff in this case was not required to be in a state of absolute helplessness in order to receive the benefit of the extension of time for filing her claim, but if ▮▮▮▮ she was in such a condition as would render her unable to perform all of the substantial and material acts necessary to the prosecution of her case, she would be entitled to the extension of the time and the filing of her claim with the Treasurer of the City would be in time.

This leads us to a consideration of the evidence adduced on the question. We quote from the bill of exceptions from the evidence given by the plaintiff, Jeanette Falzgraf Nead:

"Q. Your name is Jeanette Falzgraf Nead, is it?

A. Yes.

Q. And where do you live, Mrs. Nead?

A. I live in Westwood now.

Q. Speak out loud so we can all hear you. In Westwood?

A. 3415 Locust.

Q. You are the plaintiff in this case?

A. Yes.

Q. At the time that this accident happened, on February 26th, 1938, you were not married as yet?

A. No.

Q. At that time your name was Jeannette Falzgraf?

A. Yes.

Q. And after that you married Mr. Nead?

A. Yes.

Q. Now, Mrs. Mead, you were the plaintiff also in the case against Bruce Jones, were you not?

A. Yes.

Q. After the accident occurred, after the collision occurred, the time when you were a guest in Mr. Nead's automobile, for how long a time were you incapacitated?

Mr. Shannon: I object. It calls for a conclusion.

Q. Well, for how long a time were you sick?

Mr. Shannon: Objection.

The Court: Overruled.

A. I was in bed five or six weeks.

Q. And what was your condition during those five or six weeks?

A. I couldn't eat anything, my face was so swollen up, my nose was so swollen and mashed. I just had to lay flat on my back.

Q. Were you able to speak during that time?

A. It was very painful.

Q. Now, then, what was your general condition—were you able to do anything? A. No.

Mr. Shannon: I object.

Q. Did you leave the house during that time?

Mr. Shannon: I object.

The Court: Overruled.

Mr. Shannon: Exception.

Q. Did you leave the house during that time?

A. I went to see the doctor once.

Q. Did you communicate with anybody with reference to your injuries?

A. No.

Mr. Shannon: The same objection.

The Court: Overruled.

Mr. Shannon: Exception.

Q. Now then about when was it that you were able to talk to people?

A. It took several weeks before the swelling went down in my face. It was so painful to talk that I just stayed in bed, and worried about my nose so much I was in an awful nervous condition. I am still nervous when I ride in any machine.

Q. Tell us this, Mrs. Nead, do you recall the time that Mr. Duerr came up to your house and you signed those

papers that are in evidence in this case? A. Yes.

Q. You recall that. Were you in bed then?

A. I don't know. I don't think I was in bed at that time; but I was at home.

Q. Were you able to do anything before that time?

A. No.

Her cross-examination failed to deduce any contrary evidence. It, therefore, appears from her evidence, which is not impeached by any contrary evidence, that the plaintiff was injured on February 26th, 1938, and that she sustained severe injuries to her face and nose; that she was in bed for five or six weeks; that she remained in the house during all that period with the exception of one visit to her Doctor's Hospital, and that she was up and around the house part of that time. Of course, if this was true, and there is nothing to refute it, she would be unable and excused from complying with the thirty (30) day limitation from the day of the accident, and her time for filing her claim would be extended beyond the time when she actually filed her claim with the City Treasurer, to-wit: on April 15, 1938.

Her cross-examination emphasized the seriousness of her condition and the facts to which she had testified.

Thereupon, the plaintiff rested and the defendant moved for an instructed verdict, which the Court overruled.

Thereupon, the defendant called Dr. Henry A. Springer, and offered his testimony on behalf of the defendant. Dr. Springer was the surgeon who attended the plaintiff at the Deaconess Hospital, on the night she was injured, where she was taken immediately following the accident. The pertinent part of Dr. Springer's testimony we quote:

"Q. Doctor, will you state your name, please?

A. Henry A. Springer.

Q. What is your address?

A. 869 Ludlow Avenue.

Q. Cincinnati? A. Cincinnati.

Q. Are you a practicing physician and surgeon in this county?

A. Yes, sir.

Q. How long have you been engaged in the practice of medicine?

A. Since 1916.

Q. On or about the 26th of March of 1938 did you treat one Miss Jeanette Falzgraf? A. Yes, sir.

Q. What was the occasion of that treatment—do you remember?

A. I was called to the hospital to treat this patient that had been injured.

Q. And what hospital was that?

A. Deaconess Hospital.

Q. Do you recall what time of the day or night that was?

A. It was about some time between nine and ten P. M.

Q. When you arrived, Doctor, what injuries did you find had occurred on Miss Falzgraf?

A. The patient's nose had been crushed off her face and was lying to the left side of her face.

Q. Did you administer treatment?

A. It was necessary to give her an anaesthetic and re-mold the bone back into position.

Q. And was that done?

A. Yes, sir.

Q. And when was that done?

A. Immediately.

Q. Now following the operation do you know when the patient was discharged?

A. I left her go home the following day.

Q. And did you see her before she went home?

A. Yes, I gave her final instructions as to what I wanted her to do.

Q. And did you talk with her at that time when you discharged her from the hospital?

A. Yes, sir.

Q. And do you know, Doctor, how she was taken home, or how she went to her home from the hospital?

A. I don't recall.

Q. And when did you next see her?

A. Well, I am a surgeon of the group so I don't follow the cases up. It is

done by the Medical Division or the family physician.

Q. And your testimony is that you did not see her after the operation?

A. I did at my office at some later date I don't recall. I mean I didn't see her at home because I had instructed her to stay in bed two weeks and stay within the building at least six weeks, depending, I mean, on that type of work.

Q. Now in this conversation that you had with her on the morning following the operation, did she converse with you?

A. Well, I don't recall any details. I merely informed her what I wanted done, as to the seriousness of the injury.

Q. Did she say anything to you that morning?

A. Well, I would just be guessing if I told you that she made a statement.

Q. Was she able from her condition at that time to say anything to you?

A. Well, I thought she would be able to talk as far as speech is concerned.

Q. Were there any other injuries, Doctor, beside the broken nose mentioned?. A. Yes.

Q. Will you tell the Court?

A. There were multiple bruises that were of minor character compared to this being broken right off into the head and turned over on to the cheek.

Q. Following this operation you gave her instructions that she should go home and remain in bed for two weeks? A. Yes.

Q. And remain in the house a total of six weeks?

A. That is right.

Q. Did you give her any instructions with reference to her diet?

A. Well, that wouldn't be important in the case of an injury of that kind if they are bruised put them on a light diet.

Q. Therefore, Doctor, in your opinion she was able to eat as soon as she got home, is that correct?

A. After an injury of that type you wouldn't care to eat solid food, possibly for a few days, because, naturally, that type of injury when your own face is disfigured, you don't recognize your face. You feel bad.

Q. And in your opinion, Doctor, how long would it be after an operation of that type until a person could eat normal diet?

A. Well, that would vary with every individual case, depending upon the amount of injury and trauma to the tissues, and the reaction that the patient has, which again varies.

Q. In your opinion, Doctor, how soon after an operation of this type would it be before the patient could talk to the people of the household, carry on a conversation?

Mr. Gesimar: I object to that. I don't think that that is relevant.

The Court: Unless he has knowledge of the particular case and has seen the patient after the time he treated her at the hospital he would not know about that.

A. No.

Mr. Shannon: I tried to make it a hypothetical question.

Q. Doctor, do you know whether or not a member of your staff at your clinic did treat her?

A. I am satisfied because I wouldn't turn a patient of this type out and not have it followed up.

Q. Did you at your office have any such records of any such treatment?

A. This is 1938 it happened, so I have not got the record.

BY THE COURT:

Q. In what condition was her face at the time?

A. Of the accident, Judge, the whole thing—I have a skeleton and can probably show you more definite. The thing that happened, the bone was broken up into the brain. That is why the thing was dangerous. Of course, you see this piece here and this, of course that is bone worn away and wasted away. That bone here goes all the way through your body. This thing was all broken in through here on her face. I didn't recognize the patient I operated before, due to the complete displacement of this bone, and it was necessary under anaesthesia to do what we call a plastic with a metal instrument

to right this bone back in position. Of course, now, the net result in a case of that kind, you have to always keep under careful diagnosis at least two weeks in bed. There is danger from Meningitis. Then the fracture not only broken off here can just as well be carried on into the brain. That is the rule, like Monro, to keep these people at least two weeks in bed and he even suggests six weeks in and up about the house. I only told the patient two weeks in bed, six weeks altogether. I didn't tell her six weeks following two weeks as Monro suggests.

Q. Could you tell what effect the accident had upon the use of her mental faculties?

A. A patient injured that bad may be confused for some time after the injury. As to the complete outcome, a doctor never can say. It all depends on how much hemorrhage you have. It was necessary to pack these bones so they stayed in position for twenty-four hours; then she was not allowed to blow her nose or anything."

This was in substance all the evidence relating to the injury and the condition of the plaintiff for the few weeks following the time of the accident.

At the close of all the evidence, the defendant renewed its motion for judgment for the deefndant, which motion was granted by the trial court.

It is difficult to understand how the court arrived at that conclusion, in view of the evidence and the provision in the ordinance. Plaintiff, in order to prepare her claim, would have been required to investigate many things concerning the accident, interview many persons and witnesses, ascertain the time, the hour of day of the accident, the license number of the car, the name and address of the driver of the automobile which caused the injury, and the names and addresses of any known witnesses. Certainly, she established her physical and mental condition to be such as to bring her within the saving clause of the ordinance as to the time of filing her claim.

There is no special conflict in the evidence as to her condition. The only evidence on the point offered by defendant, was the evidence of Dr. Springer, one of the defendant's witnesses, which testimony fully corroborated plaintiff's evidence as to her condition. This being true, the trial court should have granted judgment for the plaintiff, rather than for the defendant.

Applying the liberal rule of construction to the ordinance and considering the evidence as to proof of disability, our conclusion is that the plaintiff is entitled to judgment as prayed for in her petition.

The judgment will be reversed, and judgment will be entered in this court in favor of the appellant.

MATTHEWS, PJ. & ROSS, J., concur.